United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9                           UNITED STATES DISTRICT COURT

10                          NORTHERN DISTRICT OF CALIFORNIA

11

12    EVANS ET AL,                              No. C 11-01078 DMR

13              Plaintiffs,                      **ORDER ON MOTION FOR CLASS
                                                 CERTIFICATION**
14         v.

15    LINDEN RESEARCH, INC. ET AL,

16              Defendants.
      _____/
17

18         Before the court is Plaintiffs' motion for class certification.  [Docket No. 96.]  Having

19    considered the relevant legal authority, the submissions, and the arguments of counsel, the court

20    grants Plaintiff's motion in part and denies it in part.

21                                    **I.  BACKGROUND**

22         This putative class action involves the internet role-playing virtual world entitled Second

23    Life.  In Second Life, participants create characters called avatars to represent themselves and to

24    interact with other avatars in a huge virtual world.  Participants establish reputations, run and

25    patronize businesses, and buy and sell virtual items such as clothing, cars, and homes (referred to as

26    "virtual items").  They also purchase and sell pieces of "virtual land" from Defendant Linden

27

28

**United States District Court**

For the Northern District of California

1   Research, Inc. ("Linden") and other participants.[1]  Participants use in-game money, known as

2   "lindens,"[2] to perform in-world monetary transactions.  The linden currency can be purchased with,

3   as well as exchanged into, U.S. dollars.

4           Linden retains and stores virtual items and virtual land on its servers.  Participants with

5   virtual land must pay Linden monthly "tier fees," similar to property taxes, that vary in amount

6   depending on the size of the virtual land that they possess.[3]  According to Linden, these tier fees help

7   pay for the maintenance of the servers on which the game data is stored.  (Hr'g Tr. 9:22-23, July 26,

8   2012.)  After purchasing virtual land, a user may "inhabit" it, rent it out, split it, and/or resell all or

9   part of it to other participants.  Linden continually creates "new" virtual land; once Linden sells land

10  to a participant, it continues to exist in Second Life and is not deleted or removed from the game.

11          The central dispute in this lawsuit is the meaning of "ownership" within Second Life.  As

12  discussed in more detail below, Plaintiffs contend that Linden and Defendant Philip Rosedale,

13  Linden's founder, former CEO, and current board member, represented to Second Life participants

14  that they would have an actual ownership interest in the virtual land and items in Second Life's

15  virtual world.  By contrast, Defendants argue that when they represented that participants would

16  have "ownership" rights, they meant that Second Life users would own a copyright in their

17  creations.

18          The battle over the meaning of "ownership" has its roots in Second Life's marketing efforts.

19  Linden launched Second Life in 2003.  Plaintiffs allege that to differentiate Second Life from other

20  massively multiplayer role-playing games ("MMORPGs"), Linden "made a calculated business

21  decision to depart from the industry standard of denying that participants had any rights to virtual

22  items, land and/or goods" and "globally represented to participants . . . that their ownership rights

23  and intellectual property rights to the virtual items, land and goods held in the participants' accounts

---

[1]  Unless otherwise noted, all facts are taken from Plaintiffs' Second Amended Complaint.

[2]  To avoid confusion with Defendant Linden, the court will refer to the monetary unit as a "linden," using a lower case "l."

[3]  Linden does not charge any fees in connection with the creation or maintenance of virtual items.  However, if a participant sells a virtual item to another participant, the buyer pays the purchase price to the seller, and Linden receives a commission on every sale.  (Hr'g Tr. 6:13-22, July 26, 2012.)

1    would be preserved and recognized." (2d Am. Compl. ¶ 45.) Plaintiffs further allege that over the

2    next several years, Defendant Rosedale began a campaign to attract users to Second Life by publicly

3    representing that users retained "ownership" rights to the land they purchased from Linden, and that

4    they retained intellectual property rights for any virtual items or content created by the user. During

5    this time, the following statement appeared prominently on the Second Life homepage: "SECOND

6    LIFE IS AN ONLINE, 3D VIRTUAL WORLD, IMAGINED, CREATED AND *OWNED* BY ITS

7    RESIDENTS." (2d Am. Compl. ¶ 87 (emphasis in original); Archinaco Decl. ¶ 16, May 7, 2012.)

8         According to Plaintiffs, sometime after 2007, following a dispute with an individual user

9    regarding Linden's alleged confiscation of virtual property, Linden abruptly removed the word

10   "owned" from the statement on its homepage, so that it became: "SECOND LIFE IS AN ONLINE,

11   3D VIRTUAL WORLD, IMAGINED AND CREATED BY ITS RESIDENTS." (2d Am. Compl. ¶

12   89; Archinaco Decl. ¶ 16.) Plaintiffs allege that after years of representations by Defendants about

13   ownership, designed to induce users to invest U.S. dollars in virtual land and items, Linden began to

14   strip ownership rights from its users. Linden's decision to strip Second Life users of their ownership

15   rights culminated in March 2010, when Linden modified its Terms of Service ("TOS"). For the first

16   time, the TOS stated that "[v]irtual land is in-world space that we license." (Archinaco Decl. ¶

17   12(d); Lack Decl. Ex. F at 18, June 5, 2012.) Participants who had purchased virtual land or items

18   prior to the March 2010 TOS were required to accept the new terms; there was no ability to opt out.

19   (Pls.' Mot. 6.) If a user did not click "I accept" to the new terms, they could no longer access their

20   virtual land or items. (Pls.' Mot. 6.)

21        The parties have very different understandings of what Defendants intended to provide when

22   they offered "ownership" in Second Life virtual land and items. Plaintiffs contend that Second Life

23   participants gained actual ownership rights in virtual land and items that exist in cyberspace.

24   Defendants assert that Second Life users own copyrights in the virtual land and items that they

25   purchase or create. By way of illustration, Plaintiffs' counsel made the following statements during

26   oral argument on this motion:

27        **THE COURT**: What do class members own? . . .

28

**MR. ARCHINACO:**  We believe that they own a piece of the Second Life world.  If you own land, you own a part of the Second Life world.

**THE COURT:**  So is it that you own code?  Do you own a piece of the server that the code resides on?

**MR. ARCHINACO**: The answer is, your honor, I don't believe you own the server.  You don't own the physical server.

The code, obviously, resides on a server.  And the server then, you know, or the code creates a virtual world.  There's a map.  There's a map just like there would be a real world map.  And there's [sic] locations on the map.  Similar in the sense that the internet, as an example, is really a map of various addresses.

So if you own a domain name, you know, what do you own?  You own the domain name.  So in a virtual world, when you own a piece of land, you own the piece of land that corresponds on the map to that location that you purchased.

So it's similar to a domain name in the sense that there's a specified location on a map and that's what you own.  And it's part of the overall world.  It's part of the overall Second Life world.

(Hr'g Tr. 27:12-28:11.)

Thus, as described by Plaintiffs in their Second Amended Complaint, their understanding of Second Life "ownership" goes well beyond intellectual property rights:

The owner of the account is entitled to control the account and valuables' electromagnetic record and may freely sell or transfer it.  Although a participant's account and valuables are "virtual," they are valuable property in the real world.  Participants can auction them, sell them, license them or transfer them online and through other independent third parties, like eBay.com, slexchange.com, and others.

(2d Am. Compl. ¶ 105.)  According to Plaintiffs, "the system of transferring the virtual items and objects created by a participant mirrors that of the real world in nearly every respect."  (2d Am. Compl. ¶ 107.)  Further, Plaintiffs allege that a user's interests in virtual property and virtual land "persist regardless of the system currently connected to [the virtual property and virtual land], separate from the intellectual property that exists in Defendants' underlying code."  (2d Am. Compl. ¶ 109.)

In contrast, Defendants contend that Second Life users can create content in the virtual world and that those users own the copyright in their creations, as well as a license to use the Second Life computing resources, as set forth in the TOS.  However, according to Defendants, Second Life users do not have ownership interests in real or personal property beyond what is provided by contract through the TOS.  Defendants contend that Second Life participants own intellectual property in the

form of a copyright, for, as defense counsel succinctly articulated during oral argument, "You have to remember this stuff isn't real. It's a game on a computer." (Hr'g Tr. 36:19-20):

> **MR. PAGE:** Linden has always from day one unchanged [sic] and they made no allegation that we have changed the rules, have told people that when you create content in Linden – in Second Life, unlike in other games, you own the intellectual property.
>
> . . . .
>
> We have never interfered with anyone's copyrights. That's all you can own in a work of expression, right?
>
> The copy that you put on Linden's server is Linden's, and it's always been very clear. The copy that you have in your own computer, if you put a copy in your own computer, when we close your account, we haven't taken away that copy and we haven't taken away your copyright.
>
> . . . .
>
> What you owned you still own. If you owned the copyright, you still do. Nothing – there is no allegation that any cognizable property right has been taken away from anyone as a – as a result. The property right here is a copyright and it is never taken away.
>
> Our right to remove the bits from our servers of a copy that you licensed to us, is not a property right that the plaintiff ever owned. There's no coherent allegation that there is any such property right. It is not real property. It's not personal property; it is an intellectual property.

(Hr'g Tr. 37:7-10; 39:17-24; 53:15-24.)

Plaintiffs Carl Evans, Donald Spencer, Valerie Spencer, and Naomi Hemingway are individuals who have participated in Second Life. They allege that they purchased virtual items and/or virtual land and subsequently had their accounts unilaterally terminated or suspended by Linden, and were not compensated for the value of the virtual land, items, and/or currency in their accounts. In their Second Amended Complaint, Plaintiffs further assert that Defendants made false representations about ownership of virtual land and virtual items, and wrongfully confiscated virtual land and items from them, as well as from the class members they seek to represent.

Plaintiffs seek certification of two proposed classes pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3):

> a. The "Main Class." All persons who are or were owners, possessors, purchasers, creators or sellers of virtual land or any other items of virtual property or items as participants in the Second Life game at any point between November 14, 2003 and the date of class certification;

United States District Court
For the Northern District of California

b.      "Subclass A." All persons whose assets, including virtual property and real-world personal property (such as in-game accounts funded with U.S. dollars), have been deliberately and intentionally converted, taken, "frozen," or otherwise rendered unusable by Defendant Linden.

During oral argument, in response to detailed questions by the court, Plaintiffs amended their proposed class definitions in several ways. With respect to the Main Class, Plaintiffs withdrew the term "possessors" as duplicative of "owners." (Hr'g Tr. 4:25-5:17.) Plaintiffs also conceded that the Main Class did not include participants who owned or created virtual items, but never purchased or sold them. (Hr'g Tr. 50:15-24.) Plaintiffs also clarified at oral argument that Subclass A members only include participants who lost access to their accounts through a specific action initiated by Second Life, such as account closure or suspension. Thus, Subclass A is limited to class members who claim that they were not compensated for valuables existing in their accounts when Linden took some affirmative action to block access to their accounts. Subclass A does *not* include claims that class members had their valuables "confiscated" by Linden by virtue of the fact that they had to agree to the TOS as a prerequisite to accessing their Second Life accounts. (Hr'g Tr. 35:19-25.)

To summarize, the gist of the Main Class claims is that Defendants first lured class members into participating in Second Life by making false promises that the participants would actually "own" their virtual land and items, and then later reneged on those promises. The essence of the Subclass A claims is that Defendants unlawfully converted class members' valuables by suspending or closing their accounts without reimbursing them for the value of the confiscated currency, virtual land and virtual items held in those accounts.

Plaintiffs assert the following claims on behalf of the proposed classes:

a.      On behalf of the Main Class:

i.      Violation of Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750 *et seq*.;

ii.     Violation of the False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500;

iii.    Violation of the California Auction Law, Cal. Civ. Code § 1812.600 *et seq*.;

iv.     Violation of the Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq*.; and

United States District Court

For the Northern District of California

           v.        Fraud and/or Fraud in the Inducement.

    b.    On behalf of Subclass A:

           i.        Conversion against Linden;

           ii.       Intentional Interference with Contractual Relations/Prospective Economic Advantage against Linden; and

           iii.      Unjust Enrichment against all Defendants.[4]

Plaintiffs seek appointment of Plaintiffs Carl Evans, Donald Spencer, Valerie Spencer, and Naomi Hemingway as Class Representatives of the Main Class and Subclass A.  Plaintiffs also move for appointment of Jason Archinaco and Robert Bracken of Archinaco/Bracken, LLC, and Michael Aschenbrener of Aschenbrener Law, P.C. as Class Counsel.

## II.  LEGAL STANDARD

Federal Rule of Civil Procedure 23 governs class certification.  A plaintiff seeking class certification bears the burden of demonstrating that he or she has met each of the four requirements of Rule 23(a), and at least one of the requirements of Rule 23(b).  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979-80 (9th Cir. 2011) (citing *Zinser v. Accufix Research Institute, Inc.*, 253 F.3d 1180, 1186 (9th Cir.), *amended by* 273 F.3d 1266 (9th Cir. 2001)); *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 724 (9th Cir. 2007).  Rule 23(a) provides that a court may certify a class only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a).  In addition, a plaintiff must establish one or more of the following grounds for maintaining the suit as a class action: (1) that there is a risk of substantial prejudice from separate actions; (2) that declaratory or injunctive relief benefitting the class as a whole would be appropriate; or (3) that common questions of law or fact predominate, and the class action is superior to other available methods of adjudication. Fed. R. Civ. P. 23(b).

---

[4] At oral argument, Plaintiffs dropped their class claims for wrongful ejectment or expulsion. (Hr'g Tr. 41:24-42:2.)

**United States District Court**
For the Northern District of California

"Rule 23 does not set forth a mere pleading standard.  A party seeking class certification must affirmatively demonstrate his compliance with the Rule – that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011).

> [I]t may be necessary for the court to probe behind the pleadings before coming to rest on the certification question, and certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied. Frequently that rigorous analysis will entail some overlap with the merits of the plaintiff's underlying claim.

*Id.* (citations and internal quotation marks omitted).  Any doubts regarding the propriety of class certification generally should be resolved in favor of certification.  *See, e.g.*, *Wolph v. Acer*, 272 F.R.D. 477, 481 (N.D. Cal. 2011) (citing *Gonzales v. Arrow Fin. Servs., LLC*, 489 F. Supp. 2d 1140, 1154 (S.D. Cal. 2007)).  Further, "[c]lass certification is not immutable, and class representative status could be withdrawn or modified if at any time the representatives could no longer protect the interests of the class." *Cummings v. Connell*, 316 F.3d 886, 896 (9th Cir. 2003) (citing *Soc. Servs. Union, Local 535 v. Cnty. of Santa Clara*, 609 F.2d 944, 948-49 (9th Cir. 1979)).

## III. DISCUSSION

### A.   The Main Class

#### 1.   Standing

As a threshold matter, Defendants contend that Plaintiffs have not met their burden of demonstrating an injury in fact to satisfy the constitutional standing requirement with respect to the Main Class claims.  Mindful that "Rule 23's requirements must be interpreted in keeping with Article III constraints," the court first determines whether the named plaintiffs have standing to bring the claims asserted on behalf of the Main Class.  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997); *see also In re Abbott Labs. Norvir Anti-Trust Litig.*, Nos. C 04-1511 CW, C 04-4203 CW, 2007 WL 1689899, at *2 (N.D. Cal. June 11, 2007) ("[I]t is 'well-settled that prior to the certification of a class, and technically speaking before undertaking any formal typicality or commonality review, the district court must determine that at least one named class representative has Article III standing to raise each class subclaim.'" (quoting *Wooden v. Bd. of Regents of Univ. Sys. of Ga.*, 247 F.3d 1262, 1287-88 (11th Cir. 2001)).

**United States District Court**

For the Northern District of California

To satisfy the Article III standing requirement, Plaintiffs must show: (1) an "injury in fact" that is concrete and particularized, as well as actual or imminent, and not conjectural or hypothetical; (2) that the injury is fairly traceable to Defendants' challenged conduct; and (3) that it is likely, as opposed to merely speculative, that a favorable decision will redress the injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). "[E]ach element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id.* at 561. On a motion for class certification, Plaintiffs must demonstrate, not merely allege, that they have suffered an injury-in-fact to establish Article III standing to bring the claims asserted on behalf of the Main Class. *See Nelsen v. King Cnty.*, 895 F.2d 1248, 1249-50 (9th Cir. 1990) ("Standing is a jurisdictional element that must be satisfied prior to class certification." (citation and quotation marks omitted)).

More specifically, in order to establish standing to sue on their Unfair Competition Law and False Advertising Law claims, Plaintiffs must show that they suffered an "injury in fact," *and* that they "[have] lost money or property" as a result of Defendants' alleged conduct. *See* Cal. Bus. & Prof. Code §§ 17204, 17535; *see also Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 321-22 (2011); *In re Tobacco II Cases*, 46 Cal. 4th 298, 314 (2009); *Rubio v. Capital One Bank,* 613 F.3d 1195, 1203-04 (9th Cir. 2010). Like the UCL, the Consumer Legal Remedies Act contains a specific standing provision. California Civil Code section 1780(a) provides, "Any consumer who suffers any damage as a result of the use or employment by any person of a method, act, or practice declared to be unlawful by Section 1770 may bring an action" under the CLRA. Thus, to pursue a CLRA claim, Plaintiffs must have been "exposed to an unlawful practice," and "some kind of damage must result." *Meyer v. Sprint Spectrum L.P.*, 45 Cal. 4th 634, 641 (2009). With respect to their common law fraud claim, Plaintiffs must also show that they incurred injury as a result of an alleged fraudulent deception. *Tobacco II Cases*, 46 Cal. 4th at 312.

Plaintiffs allege that Defendants knowingly and actively misrepresented that "all right, title and interest to the virtual land and all associated ownership rights would pass to buyers and that [they] would retain their intellectual property rights in and to virtual items." (2d Am. Compl. ¶ 229.)

Of the five claims brought on behalf of the Main Class, four are based upon some variation of this allegation, i.e., that Defendants misrepresented Second Life users' ownership rights in virtual land and virtual property.[5]  (*See* 2d Am. Compl. ¶¶ 41-57.)  Defendants argue that Plaintiffs have not established how the alleged misrepresentations caused actual damage or injury in fact, and therefore, Plaintiffs lack standing to bring the claims asserted on behalf of the Main Class.

The court concludes that Plaintiffs have not sufficiently demonstrated injury-in-fact to meet the requirements for standing to bring the CLRA, FAL, UCL, and fraud claims on behalf of the Main Class.  In their motion for class certification, Plaintiffs did not describe any economic harm they allegedly suffered as a result of Defendants' alleged misrepresentations about ownership. Plaintiffs offered a theory of economic harm only in their reply brief: "Plaintiffs either would not have purchased virtual land or items at all, or at least would have paid less for the land and items had Defendants not misrepresented that Second Life users would 'own' the land and items, and not merely 'license' the land and items."  (Pls.' Reply 2.)  The problem is that Plaintiffs did not offer a shred of evidence in support of the existence of any such economic injury.

The difference between the price paid based on a misrepresentation and the price the consumer otherwise would have been willing to spend may be a viable measure of damages for violations of the UCL and FAL.  In *Kwikset*, the California Supreme Court analyzed the economic harm suffered by consumers who purchased a product based on misrepresentation.  In that case, plaintiffs brought UCL and FAL claims based on allegations that a manufacturer falsely marketed and sold locksets labeled as "Made in U.S.A." even though the locksets contained foreign-made

---

[5]  The remaining claim brought on behalf of the Main Class is violation of the California Auction Law, Cal. Civ. Code § 1812.600, *et seq*., addressed below.

The court notes that Plaintiffs' briefing makes some reference to the TOS in their description of the Main Class claims.  (Pls' Mot. 15.)  However, although Plaintiffs assert in their Second Amended Complaint that the TOS is an adhesion contract and that it contains a number of unconscionable terms, (2d Am. Compl., ¶¶ 157, 159, 164), they do not make any claims on behalf of the Main Class that are premised on these allegations.  Accordingly, the court will focus on Plaintiffs' standing for Main Class claims solely as it relates to Defendants' alleged misrepresentations.

In contrast, the claims brought on behalf of Subclass A "revolve around the unconscionability of the forfeiture clause of the TOS, which not only permits customers' accounts to be closed without notice or process, but also permits Defendant Linden to confiscate the virtual land, items, [l]indens and U.S. dollars in the customers' accounts."  (Pls.' Mot. 15.)

parts or involved foreign manufacture.  *Kwikset*, 51 Cal. 4th at 316.  The court discussed the issue of

standing in these terms:

> For each consumer who relies on the truth and accuracy of a label and is deceived by misrepresentations into making a purchase, the economic harm is the same: the consumer has purchased a product that he or she paid more for than he or she might otherwise might have been willing to pay if the product had been labeled accurately.  This economic harm –  the loss of real dollars from a consumer's pocket – is the same whether or not a court might objectively view the products as functionally equivalent.

*Id*. at 329.  The court held that "because of the misrepresentation the consumer (allegedly) was made

to part with more money than he or she otherwise would have been willing to expend . . . [t]hat

increment, the extra money paid, is economic injury and affords the consumer standing to sue."  *Id*.

at 330.

During oral argument in the present case, Plaintiffs asserted that, as in *Kwikset*, "these

persons had paid for something that do[es] not possess the qualities they thought they were paying

for.  Much like the plaintiffs in the *Kwikset* case thought they were buying locks that were made in

the U.S.A."  (Hr'g Tr. 51:7-11.)  Thus, according to Plaintiffs, had Defendants not misled them

about the nature of ownership in Second Life, Plaintiffs "would not have paid as much money to

lease, license, or rent something as they would have to own it."  (Hr'g Tr. 51:18-20.)  However, on a

motion for class certification, Plaintiffs must put forward evidence demonstrating, not merely

alleging, that they have actually suffered the injury in fact that is necessary to establish legal

standing to pursue the claims asserted on behalf of the Main Class.  *Nelsen*, 895 F.2d at 1249-50.

Plaintiffs have presented no such evidence.

It is worth noting that *none* of the named plaintiffs bring claims that echo those they seek to

prosecute on behalf of a similarly situated Main Class.  The Second Amended Complaint contains

fairly bare allegations about the named plaintiffs, alleging merely that each of them purchased

virtual land and/or items in Second Life, and that each "believed [he or she] owned them."  Linden

then "took" such virtual land and items from each named plaintiff and "terminated [his or her]

access" to them.  (2d Am. Compl. ¶¶ 121-123.)  While such allegations coincide with the Subclass A

claims, they do not speak to the misrepresentation claims that are at the heart of the Main Class.

More importantly, Plaintiffs' motion papers did not present *any* evidence to support the injury they

United States District Court

For the Northern District of California

now claim: namely, that if Plaintiffs had known that they were not actually obtaining ownership

rights in Second Life virtual land or items, they would not have purchased them, or at least would

have paid less.  *Cf. Keilholtz v. Lennox Hearth Prods., Inc.*, 268 F.R.D. 330, 336 (N.D. Cal. 2010)

(granting motion for class certification where named plaintiffs had standing based on testimony that

they would not have purchased product at issue had they known of safety defect).

     The only testimony in the record regarding Defendants' alleged misrepresentations of

"ownership" of virtual land and/or virtual items was by Donald Spencer, who testified to the

following:

> [W]hen I started the game that – everything [Defendants] promoted was it was owned by the residents.  If you created it was yours.  You owned it.  It wasn't there for [anybody] else to take away from you . . . [t]hat was one of the big draws for me and my friends to go there . . . we could go in there and create as a group, you know, or even individually belonged to each one of us.

(Archinaco Decl. Ex. 1-G at 30-31 (D. Spencer Dep.).)  While this testimony may indicate that Mr.

Spencer found the idea of Second Life "ownership" attractive, it does not constitute evidence that he

would not have purchased or spent as much money for Second Life virtual land and/or items "but for

the misrepresentation."  *See Kwikset*, 51 Cal. 4th at 330.  Plaintiffs submitted no evidence

demonstrating the required "but for" relationship between the alleged misrepresentations about

ownership, and the amount of money spent by class members.  In order to establish Article III

standing to bring the Main Class claims, Plaintiffs must not just point to a wrongful act –

Defendants' alleged misrepresentations – but must also demonstrate that the misrepresentations

resulted in a concrete injury to Plaintiffs.  *See Gonzales v. Comcast Corp.*, No. 10-cv-01010-LJO-

BAM, 2012 WL 10621, at *8 (E.D. Cal. Jan. 3, 2012) (denying certification where plaintiffs failed

to show injury flowing from allegedly wrongful acts).  This Plaintiffs have not done.  For this

reason, Plaintiffs have failed to demonstrate concrete, particularized, actual, non-hypothetical

injury.[6]

---

    [6]  For example, Plaintiffs could have attempted to offer market-based evidence of injury by comparing Second Life's financial situation or market share to those of its competitors, before and after Defendants began the alleged "ownership" marketing campaign. *See Kwikset*, 51 Cal. 4th at 328 (noting Supreme Court case law that acknowledges the central role of advertising and sales promotion in generating market share, where the competing products are functionally identical).  Though such evidence alone may or may not be adequate proof of economic injury to the class, at least it could

At oral argument, Plaintiffs' inability to articulate a coherent remedial theory highlighted the absence of a concrete and non-conjectural injury. During the hearing, Plaintiff's counsel presented radically shifting measures of recovery,[7] ultimately settling on the following: the monetary remedies for misrepresentation regarding ownership of virtual land would be measured by the entire price paid for the land – whether paid to Linden or to another Second Life participant – plus the tier fees paid to Linden. (Hr'g Tr. 26:1-21.) The monetary remedies for misrepresentations about ownership of virtual items would be measured solely by the transaction fee that was paid to Linden "under a false premise [of ownership]" as part of every purchase or sale of such an item. (Hr'g Tr. 20:20-21:4; 22:20-23.) However, Plaintiffs' concept of economic injury, borrowed from *Kwikset*, is that they "[were] made to part with more money than [they] otherwise would have been willing to expend" on virtual land and/or virtual items. *Kwikset*, 51 Cal. 4th at 330. By contrast, their proffered method of calculating the corresponding economic losses – the full price paid for virtual land plus tier fees paid to Linden, and the transaction fee paid to Linden in connection with the purchase of virtual items – does not even remotely track this theory of injury.

As a further illustration of this problem, Plaintiffs first argued that the remedy for misrepresentations about ownership of virtual items should include the price paid for such items. (Hr'g Tr. 21:6-11; 21:19-22:12.) They then backed away from this, instead taking the position that there is no injury when one user buys an item from another user, and the item stays in the buyers' account. (Hr'g Tr. 23:12-24:19.) Yet Plaintiffs did not explain why their logic did not also apply to virtual land, at least in situations where a participant was purchasing land from another participant,

provide some actual evidence of injury for purposes of establishing standing.

[7] To give an example of these shifting remedial theories, Plaintiffs' co-counsel Aschenbrener first argued that the remedies for misrepresentations about ownership of virtual items should include both the transaction fees paid to Linden, as well as the price paid for the item itself. (Hr'g Tr. 21:6-11; 21:19-22:12.) But Plaintiffs' co-counsel Archinaco soon back-pedaled, stating that the proper remedy regarding virtual items would only be the transaction fee paid to Linden, since there is no injury when one participant buys an item from another participant, and it remains in the buyers' account. (Hr'g Tr. 22:20-24:19.)

Plaintiffs similarly initially argued that such remedies should be made available to class members who created content but did not sell any of it. (*See, e.g.*, Hr'g Tr. 21:12-18.) They later changed their minds. (Hr'g Tr. 50:15-24.)

United States District Court

For the Northern District of California

1    rather than directly from Linden.  More importantly, Plaintiffs failed to demonstrate any connection

2    between transaction or tier fees paid to Linden and the claimed injury.  This disconnection casts

3    further doubt on the existence of an injury in fact.

4        With respect to Plaintiffs' claim under the California Auction Law, California Civil Code

5    section 1812.600,[8] Plaintiffs have done nothing beyond reciting the elements of a statutory violation

6    in the allegations of the Second Amended Complaint.  Plaintiffs have not proffered any evidence to

7    demonstrate injury that is fairly traceable to any alleged violations of that statute, and so have not

8    met their burden to show that they have standing to bring this claim.  Plaintiffs may not, therefore,

9    proceed with this particular claim on a class-wide basis.

10       In summary, the named plaintiffs have not established Article III standing to pursue any of

11   their claims brought on behalf of the Main Class.  The court therefore does not reach the Rule 23

12   analysis for those claims.

13                    **2.      Class Definition**

14       Defendants also argue that the court should deny certification because the Main Class

15   definition is overbroad and unascertainable.  "An adequate class definition specifies 'a distinct group

16   of plaintiffs whose members [can] be identified with particularity.'"  *Campbell v.*

17   _____

18       [8] Section 1812.600 provides in part as follows:

19       (a) Every auctioneer and auction company shall maintain a bond issued by a
         surety company admitted to do business in this state.  The principal sum of the
20       bond shall be twenty thousand dollars ($20,000).  A copy of the bond shall be
         filed with the Secretary of State. . . .

21       (c)(1) No auctioneer or auction company shall conduct any business without
22       having a current surety bond in the amount prescribed by this section and without
         filing a copy of the bond with the Secretary of State. . . .

23       (l) If an auctioneer or auction company fails to perform any of the duties
24       specifically imposed upon him or her pursuant to this title, any person may
         maintain an action for enforcement of those duties or to recover a civil penalty
25       in the amount of one thousand dollars ($1,000), or for both enforcement and
         recovery.

26       (m) In any action to enforce these duties or to recover civil penalties, or for both
27       enforcement and recovery, the prevailing plaintiff shall be entitled to reasonable
         attorney's fees and costs, in addition to the civil penalties provided under
28       subdivision (l).

14

**United States District Court**
For the Northern District of California

1  *PricewaterhouseCoopers, LLP*, 253 F.R.D. 586, 593 (E.D. Cal. 2008) (quoting *Lerwill v. Inflight*

2  *Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1978)).  "A class definition should be precise,

3  objective, and presently ascertainable," though "the class need not be so ascertainable that every

4  potential member can be identified at the commencement of the action." *O'Connor v. Boeing N.*

5  *Am., Inc.*, 184 F.R.D. 311, 319 (C.D. Cal. 1998) (internal quotations omitted); *see also Holman v.*

6  *Experian Info. Solutions, Inc.*, No. C 11-0180 CW, 2012 WL 1496203, at *8 ("District courts are

7  permitted to limit or modify class definitions to provide the necessary precision.") (quoting *In re*

8  *Monumental Life Ins. Co.*, 365 F.3d 408, 414 (5th Cir. 2004)).

9       The court finds that the proposed Main Class, as currently conceived, is imprecise,

10  overbroad, and unascertainable.  It would encompass anyone who *ever* purchased or sold virtual

11  land or items in Second Life.  Accordingly, it may include individuals who were not subject to, and

12  injured by, the alleged misrepresentations about ownership.  *See Mazur v. eBay Inc.*, 257 F.R.D.

13  563, 567 (N.D. Cal. 2009) (denying motion for class certification where class would include non-

14  harmed auction winners).

15       **B.     Subclass A**

16       Having determined that Plaintiffs lack standing to bring class-wide claims on behalf of the

17  proposed Main Class,[9] the court proceeds to determine whether Plaintiffs have demonstrated the

18  requirements of Rule 23(a) with respect to Subclass A.

19            **1.     Rule 23(a) Requirements**

20                 **a.     Numerosity**

21       Plaintiffs must demonstrate that the proposed class is "so numerous that joinder of all

22  members is impracticable."  Fed. R. Civ. P. 23(a)(1); *see also Hanlon v. Chrysler Corp.*, 150 F.3d

23  1011, 1019 (9th Cir. 1998).  "Whether joinder would be impracticable depends on the facts and

24  circumstances of each case and does not, as a matter of law, require the existence of any specific

25  minimum number of class members." *Arnold v. United Artists Theatre Circuit, Inc.*, 158 F.R.D.

26  439, 448 (N.D. Cal. 1994) (citation omitted).  Courts have found 40 or more class members

27

28       [9]  Defendants do not challenge Plaintiffs' standing to bring Subclass A claims.

15

United States District Court

For the Northern District of California

1   sufficient and 21 or fewer class members insufficient to satisfy numerosity. *See Californians for*

2   *Disability Rights, Inc. v. Cal. Dep't of Transp.*, 249 F.R.D. 334, 346 (N.D. Cal. 2008); s*ee also*

3   *Morton v. Valley Farm Transp., Inc.*, No. 06-2933, 2007 WL 1113999, at *4 (N.D. Cal. Apr. 13,

4   2007).  Joinder may be impracticable where a class is geographically dispersed and class members

5   difficult to ascertain or identify. *See Haley v. Medtronic, Inc.*, 169 F.R.D. 643, 648 (C.D. Cal.

6   1996). Here, record evidence shows that of a random sampling of 500 terminated Second Life

7   accounts, two held virtual land at the time of termination. (Lack Decl. ¶ 7, Ex. A.)  Plaintiffs

8   extrapolate from this sample to contend that of the 57,000 accounts that Linden has terminated, at

9   least 228 held virtual land which Linden confiscated.[10]  (Pls.' Reply 6 n.4 (revised estimate of

10  number of accounts which held virtual land at time of termination).)

11          Defendants argue that Plaintiffs have no evidence of a class of harmed individuals because

12  Plaintiffs have identified only one individual, Ms. Hemingway, who purchased virtual land under

13  the pre-March 2010 TOS and had it "confiscated" under the March 2010 TOS.  (Defs.' Opp'n 16.)

14  Defendants further contend that Ms. Hemingway's account was properly terminated for violation of

15  Second Life's anti-fraud provisions.  (Lack Decl. ¶ 15, Ex. J.)  To begin with, as noted above,

16  Plaintiffs have now clarified that Subclass A does not include claims that Linden "confiscated"

17  virtual land, items, or currency by requiring users to accept the TOS as a prerequisite to accessing an

18  account; Subclass A only encompasses claims of unlawful confiscation through an affirmative act by

19  Linden, such as account closure or suspension.  Moreover, Subclass A is not limited just to those

20  Second Life users whose virtual land was confiscated, but includes users whose virtual items,

21  lindens, and/or U.S. dollars were taken without compensation.  (Pls.' Reply 4-5.)  Contrary to

22  Defendants' assertions, Plaintiffs have alleged a theory of liability that is not dependent on the

23  reasons for termination of the Second Life accounts.  Rather, Plaintiffs allege that when Linden

24  suspended or terminated the accounts – whether or not it had a good reason for doing so – Linden

25

26

27          [10]  Plaintiffs' sample included only terminated accounts which held virtual land.  Plaintiffs did
    not submit any sampling studies regarding terminated accounts with virtual items, lindens, or U.S.
28  dollars.  Presumably, the addition of such accounts would add to the projected size of Subclass A.

1    confiscated the virtual land, virtual items, and currency remaining in those accounts without

2    remuneration.

3        Although the exact size of the proposed class currently is not known, the sampling evidence

4    satisfies the numerosity requirement, based on a common sense extrapolation of the numbers and

5    considering the geographical dispersion of class members.  *See* 1 Newberg on Class Actions § 3.13

6    (5th ed. 2012) (opining that while plaintiff need not allege exact number or specific identity of

7    proposed class members, plaintiff must show enough evidence of class size to enable court to make

8    commonsense assumptions regarding number of putative class members).

9                            **b.        Commonality**

10       Commonality requires that there be "questions of fact or law which are common to the

11   class."  Fed. R. Civ. P. 23(a)(2).  "All questions of fact and law need not be common to satisfy the

12   rule.  The existence of shared legal issues with divergent factual predicates is sufficient, as is a

13   common core of salient facts coupled with disparate legal remedies within the class."  *Hanlon*, 150

14   F.3d at 1019; *see also Ellis v. Costco Wholesale Corp*., __ F. Supp. 2d __, __, No. C-04-3341 EMC,

15   2012 WL 4371817, at *12 (N.D. Cal. Sept. 25, 2012).  "What matters to class certification . . . is not

16   the raising of common 'questions'– even in droves – but, rather the capacity of a classwide

17   proceeding to generate common *answers* apt to drive the resolution of the litigation.  Dissimilarities

18   within the proposed class are what have the potential to impede the generation of common answers."

19   *Dukes*, 131 S. Ct. at 2551 (citation and internal quotation marks omitted).

20       Although Plaintiffs' claims have fluctuated over the course of this case, and even during oral

21   argument, the court believes that at this juncture it can fairly characterize the proposed Subclass A

22   claims as turning on at least the following common questions: (1) whether the TOS, which allows

23   Linden to confiscate class members' virtual land and items, is unconscionable or otherwise

24   unenforceable against Second Life users whose accounts Linden suspended or terminated; (2)

25   whether Subclass A members have an "ownership" right in virtual land and virtual items, and if so,

26   what is nature of that right; (3) whether Linden has an obligation to reimburse Subclass A members

27   for currency (either lindens or U.S. dollars) remaining in an account upon account closure by

28

                                     17

**United States District Court**
For the Northern District of California

1   Linden; and (4) whether Linden has an obligation to reimburse Subclass A members for virtual land

2   and virtual items in an account upon account closure by Linden.

3           Defendants contend that the primary issues driving this litigation are whether Linden

4   wrongfully terminated any individual account, and whether Linden breached any obligation to

5   compensate that individual.  (Defs.' Opp'n 17-18.)  However, the claims asserted on behalf of

6   Subclass A will not necessarily turn on whether any individual's account was terminated for good

7   cause; they are likely to turn on Linden's policies regarding the retention of any virtual land, items,

8   or currency following account termination.  Such policies would be common to all members of

9   Subclass A.  Defendants argue that the reasons for closure of a particular account – for example, for

10  fraud, or for violation of Second Life rules of conduct –  may trigger the protections of Section 230

11  of the Communications Decency Act of 1996 ("CDA"), 47 U.S.C. § 201 *et seq*.  According to

12  Defendants, Section 230 "grants absolute immunity to non-intellectual property claims" with respect

13  to acts taken by Linden as an internet service provider to filter offensive content of the Second Life

14  website.  (Hr'g Tr. 42:25-43:4; 45:13-16.)  Thus, Defendants argue that the Subclass A claims must

15  inherently devolve into individual adjudications so that the court can examine whether the reason for

16  termination of a particular account entitles Defendants to immunity through the CDA.  However, the

17  applicability of Section 230 immunity will likely present common questions of law regarding a

18  particular defense.  Such determinations can be made as to categories of reasons for account closure,

19  rather than requiring individual rulings.  The court finds that the proposed class shares sufficient

20  commonality to satisfy the requirements of Rule 23(a)(2).

21                        **c.        Typicality**

22          Typicality requires that "the claims or defenses of the representative parties are typical of the

23  claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  Rule 23(a)(3) is "'permissive' and

24  requires only that the representatives' claims are 'reasonably co-extensive with those of absent class

25  members; they need not be substantially identical.'"  *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th

26  Cir. 2010) (quoting *Hanlon*, 150 F.3d at 1020); *see also Lozano*, 504 F.3d at 734 ("Under Rule

27  23(a)(3) it is not necessary that all class members suffer the same injury as the class

28  representative."); *Simpson v. Fireman's Fund Ins. Co.*, 231 F.R.D. 391, 396 (N.D. Cal. 2005) ("In

United States District Court

For the Northern District of California

determining whether typicality is met, the focus should be 'on the defendants' conduct and plaintiff's legal theory,' not the injury caused to the plaintiff.") (quoting *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992)).  Thus, typicality is "satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability."  *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001) (quotation marks omitted) (quoting *Marisol v. Giuliani,* 126 F.3d 372, 376 (2nd Cir. 1997)), *abrogated on other grounds by Johnson v. Cal.*, 543 U.S. 499, 504-05 (2005).

Defendants contend that Plaintiffs' claims are not typical of the proposed class because the four proposed class representatives present individualized facts and circumstances.  (Defs.' Opp'n 19.)  Defendants argue that Mr. Evans and Ms. Spencer never purchased virtual land.  They cite evidence that Mr. Spencer purchased virtual land, then resold it at a profit before his account was suspended and then ultimately reinstated.  Defendants also cite evidence that Ms. Hemingway's account was suspended for credit card fraud committed by her friend, who was using Ms. Hemingway's computer.  Defendants argue that this subjects Ms. Hemingway's claims to unique defenses, including unclean hands.[11]  (Defs.' Opp'n 9, 25; Lack Decl. ¶ 15.)

While it is true that three of the four named Plaintiffs did not possess virtual land at the time Linden terminated their accounts, the class definition for proposed Subclass A covers more than possession of virtual land.  It includes individuals whose virtual land, virtual items, or currency was confiscated through an account suspension or closure by Linden.  Each named Plaintiff testified that he or she had virtual items, virtual land, and/or currency in his or her account at the time of account termination.  (*See* Archinaco Decl. Exs. 1-F at 287:7-288:16 (Evans Dep.), 1-H at 31:5-32:10 (V. Spencer Dep.), 1-G at 37:7-38:12, 65:2-19 (D. Spencer Dep.), 1-K at 3-4 (Hemingway Resp. to Interrog. No. 4).)

However, Plaintiffs have not established typicality with respect to Mr. Spencer and Ms. Spencer.  At oral argument, Plaintiffs conceded that Subclass A "only includes class members who

---

[11]  Defendants do not, however, present evidence to dispute Hemingway's contention that at the time that Linden suspended her account, it included virtual land for which she paid $200, virtual items for which she paid several thousand dollars, over $1,500 in lindens, and a balance of over $100 in U.S. currency.  (Archinaco Decl., Ex. 1-K at 3-4 (Hemingway Resp. to Interrog. No. 4.).)

**United States District Court**

For the Northern District of California

1   have been the recipient of deliberate acts by Linden such as account closure, termination, or

2   freezing"; Subclass A does not include individuals who claim that Linden "took" their virtual land or

3   virtual items by virtue of the fact that they refused to accept the TOS.  (Hr'g Tr. 33:8-34:5; 35:19-

4   25.)  Linden suspended and later reinstated accounts belonging to Donald and Valerie Spencer, but

5   both testified that they have not subsequently logged into their accounts because to do so would

6   require them to accept the TOS that they allege would strip them of their ownership rights in Second

7   Life.  (Archinaco Decl. Exs. 1-G at 37-38, 64-65, 67 (D. Spencer Dep.), 1-H at 8-9, 15 (V. Spencer

8   Dep.).)  As Linden did not confiscate the contents of the Spencers' accounts through account

9   suspension or termination, their claims are not typical of Subclass A.

10          Ms. Hemingway and Mr. Evans's claims are typical of Subclass A.  The alleged conduct by

11   Defendants is not unique to those two named plaintiffs.  *See Wolin v. Jaguar Land Rover N. Am.,*

12   *LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) ("Typicality can be satisfied despite different factual

13   circumstances surrounding the manifestation of the defect.").  The court finds that Ms. Hemingway

14   and Mr. Evans have satisfied the typicality requirement as to the claims alleging that Linden

15   unlawfully confiscated virtual land, virtual items and/or currency when it affirmatively suspended or

16   terminated their accounts.

17                          **d.      Adequacy of Representation**

18          Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the

19   interests of the class."  Fed. R. Civ. P. 23(a)(4).  "To satisfy constitutional due process concerns,

20   absent class members must be afforded adequate representation before entry of a judgment which

21   binds them."  *Hanlon*, 150 F.3d at 1020.  To determine whether the adequacy prong is satisfied,

22   courts consider the following two questions: "(1) [d]o the representative plaintiffs and their counsel

23   have any conflicts of interest with other class members, and (2) will the representative plaintiffs and

24   their counsel prosecute the action vigorously on behalf of the class?"  *Staton v. Boeing Co.*, 327 F.3d

25   938, 957 (9th Cir. 2003) (citation omitted); *see also Fendler v. Westgate-California Corp.*, 527 F.2d

26   1168, 1170 (9th Cir. 1975) (noting that representative plaintiffs and counsel also must have

27   sufficient "zeal and competence" to protect class interests).  "[T]he adequacy-of-representation

28   requirement is satisfied as long as one of the class representatives is an adequate class

1    representative." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 961 (9th Cir. 2009) (brackets in

2    original) (quotation marks omitted) (quoting *Local Joint Exec. Bd. of Culinary/Bartender Trust*

3    *Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1162 n.2 (9th Cir. 2001).)

4           Defendants contend that Plaintiffs are inadequate representatives because they have interests

5    antagonistic to the class.  Carl Evans has a demonstrated history of abusive and obscene

6    communications with other Second Life users and Linden personnel.  (Lack Decl. ¶ 12, Ex. F at ¶¶

7    11, 13.)  Although Mr. Evans's conduct may not rise to the level of criminal activity, his lewd,

8    profane, violent, and threatening language toward other users has drawn over 100 abuse reports.

9    (Lack Decl., Ex. F at ¶ 11.)  Because he has demonstrated a substantial record of abusive and hostile

10   conduct toward potential class members he seeks to represent, the court is persuaded that Defendants

11   have identified "a substantive issue for which there is a conflict of interest" with respect to Carl

12   Evans.  *Staton*, 327 F.3d at 959.

13          Defendants also challenge the adequacy of representation by Ms. Hemingway,[12] citing

14   evidence that she loaned her computer to a friend, who then committed credit card fraud on Second

15   Life.  The court determines that Defendants have not demonstrated significant credibility or class

16   member conflict issues with respect to Ms. Hemingway, and concludes that she will fairly and

17   adequately represent the interests of the class.

18          As Defendants do not challenge the adequacy of class counsel, and upon review of Plaintiffs'

19   counsel's declarations regarding their work experience, the court determines that the proposed class

20   counsel satisfy the adequacy of representation requirement.

21                  **2.      Rule 23(b) Requirements**

22          In addition to meeting all Rule 23(a) requirements, Plaintiffs must also meet at least one

23   requirement of Rule 23(b).  Plaintiffs seek certification under all three subsections of Rule 23(b).

24                  **a.  Rule 23(b)(1)**

25

26   _____

27          [12]  Defendants also challenged the adequacy of representation by Mr. Spencer.  Because the
     court has already determined that he cannot serve as a named plaintiff in that his claims are not typical
28   of Subclass A members, the court does not reach the question of whether he meets the adequacy of
     representation requirement.

1    First, Plaintiffs argue that the class should be certified pursuant to Rule 23(b)(1)(A) and(B).

2    (Pls.' Mot. 18-21.)  A class action is maintainable under Rule 23(b)(1)(A) if "prosecution of separate

3    actions . . . would create a risk of inconsistent or varying adjudications with respect to individual

4    members of the class which would establish incompatible standards of conduct for the party

5    opposing the class."  Fed. R. Civ. P. 23(b)(1)(A).  "The phrase 'incompatible standards of conduct'

6    refers to the situation where 'different results in separate actions would impair the opposing party's

7    ability to pursue a uniform continuing course of conduct.'"  *Zinser*, 253 F.3d at 1193 (quoting 7A

8    Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1773 at

9    431 (2d ed.1986)).  "Rule 23(b)(1)(A) certification requires more, however, than a risk that separate

10   judgments would oblige the opposing party to pay damages to some class members but not to others

11   or to pay them different amounts."  *Id.* at 1993 (citation and quotation marks omitted).

12   "Certification under Rule 23(b)(1)(A) is therefore not appropriate in an action for damages."  *Id.*

13   Plaintiffs contend that they seek injunctive relief on behalf of Subclass A to challenge the

14   policy or terms of service that "allow Defendants to wrongfully convert or confiscate Subclass A

15   members' virtual land and items, and real-world personal property."  (Pls.' Reply 8.)  Plaintiffs

16   assert a theory of classwide liability that turns "on whether the policy behind each confiscation was

17   common to all Subclass A members."  (Pls.' Reply 8; *see* Pls.' Mot. 19 (seeking injunctive relief on

18   behalf of Subclass A "to restore their virtual land, items, Lindens and/or U.S. currency held in

19   accounts that were wrongfully terminated")).)  While Plaintiffs concede that they also seek monetary

20   damages, they contend that monetary relief is not the primary goal of the litigation.  (Pls.' Mot. 19.)

21   The Subclass A claims alleging conversion, intentional interference with contract, and unjust

22   enrichment seek compensatory and punitive damages as well as injunctive relief, and the alleged

23   injury is directly tied to the value of the virtual land, items, and currency remaining in the terminated

24   accounts.  Plaintiffs complain that Linden "did not refund or otherwise return the consideration paid

25   for the property."  (2d Am. Compl. ¶ 257.)  The court determines that class certification under Rule

26   23(b)(1)(A) is not appropriate here because Plaintiffs primarily seek money damages on behalf of

27   Subclass A.  *Zinser*, 253 F.3d at 1193.

28

1   Similarly, certification is not appropriate under Rule 23(b)(1)(B), which permits class

2   certification where the prosecution of separate actions would create a risk of "adjudications with

3   respect to individual members of the class which would as a practical matter be dispositive of the

4   interests of the other members not parties to the adjudications or substantially impair or impede their

5   ability to protect their interests." Fed. R. Civ. P. 23(b)(1)(B). The adjudication of the Subclass A

6   claims do not create such a risk. *Cf. Green v. Occidental Petroleum Corp.*, 541 F.2d 1335, 1340 &

7   n.9 (9th Cir. 1976) (noting that certification under Rule 23(b)(1)(B) would be appropriate where "the

8   claims of all plaintiffs exceeded the assets of the defendant and hence to allow any group of

9   individuals to be fully compensated would impair the rights of those not in court").

10                          **b. Rule 23(b)(2)**

11   Plaintiffs next seek certification under Rule 23(b)(2), which allows class treatment when "the

12   party opposing the class has acted or refused to act on grounds that apply generally to the class, so

13   that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a

14   whole." Fed. R. Civ. P. 23(b)(2). In *Dukes*, the Supreme Court articulated the scope of Rule

15   23(b)(2):

16           The key to the (b)(2) class is "the indivisible nature of the injunctive or declaratory
         remedy warranted – the notion that the conduct is such that it can be enjoined or declared
17        unlawful only as to all of the class members or as to none of them." In other words, Rule
         23(b)(2) applies only when a single injunction or declaratory judgment would provide
18        relief to each member of the class. It does not authorize class certification when each
         individual class member would be entitled to a different injunction or declaratory
19        judgment against the defendant. Similarly, it does not authorize class certification when
         each class member would be entitled to an individualized award of monetary damages.
20
21   *Dukes*, 131 S. Ct. at 2557 (internal citation omitted). The Court noted that "[i]n particular, the Rule

22   reflects a series of decisions involving challenges to racial segregation – conduct that was remedied

23   by a single classwide order." *Id.* at 2558. Although *Dukes* declined to reach the question whether

24   Rule 23(b)(2) "applies only to requests for such injunctive or declaratory relief and does not

25   authorize the class certification of monetary claims at all," the Supreme Court held that Rule

26   23(b)(2) certification is not appropriate where each class member would be entitled to individualized

27   monetary relief. *Id.* at 2557. Because Plaintiffs in this case seek individualized monetary damages

28

**United States District Court**
For the Northern District of California

1  which are not incidental to the classwide claims, the court denies the motion to certify the class

2  pursuant to Rule 23(b)(2).

3                                   **c. Rule 23(b)(3)**

4        To certify a class under Rule 23(b)(3), Plaintiffs must establish that "common questions . . .

5  'predominate over any questions affecting only individual members,'" and also must establish that

6  class resolution is "'superior to other available methods for the fair and efficient adjudication of the

7  controversy.'" *Hanlon*, 150 F.3d at 1022 (quoting Fed. R. Civ. P. 23(b)(3)).

8                                   **i.   Predominance**

9        In evaluating whether common issues predominate, the operative question is whether a

10 putative class is "sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521

11 U.S. at 623. "Though common issues need not be dispositive of the litigation, they must 'present a

12 significant aspect of the case [that] can be resolved for all members of the class in a single

13 adjudication' so as to justify 'handling the dispute on a representative rather than an individual

14 basis.'" *Ellis*, __F. Supp. 2d__, __, 2012 WL 4371817, at *45 (brackets in original) (internal

15 citation and quotation marks omitted) (quoting *Hanlon*, 150 F.3d at 1022); *see also Thomas v. Baca*,

16 231 F.R.D. 397, 402 (C.D. Cal. 2005) (predominance requirement is "essentially a heightened

17 commonality inquiry: do the common legal and factual questions appear more significant than the

18 individualized factual and legal questions?").  To determine whether common issues predominate,

19 the court decides neither the merits of the parties' claims or defenses, nor "whether the plaintiffs are

20 likely to prevail on their claims.  Rather, the Court must determine whether plaintiffs have shown

21 that there are plausible classwide methods of proof available to prove their claims." *Negrete v.*

22 *Allianz Life Ins. Co. of N. Am.*, 238 F.R.D. 482, 489 (C.D. Cal. 2006); *see also Ellis*, __F. Supp.

23 2d__, __, 2012 WL 4371817, at *45 ("Courts must [] separate the issues subject to generalized proof

24 from those subject to individualized proof to determine whether plaintiffs have satisfied the

25 predominance requirement." (citation and quotation marks omitted)).  "Implicit in the satisfaction of

26 the predominance test is the notion that the adjudication of common issues will help achieve judicial

27 economy." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996).

28

Defendants contend that Plaintiffs fail to satisfy the predominance requirement because "an individualized inquiry would be required to find out why a particular account was suspended." (Defs.' Opp'n 23.)  As discussed above, at oral argument, Defendants raised the issue of possible immunity from liability under Section 230 of the Communications Decency Act.  They argue that the existence of an affirmative defense to liability as to some class members weighs against a finding that common issues predominate.  For the reasons already provided, the court finds this argument unpersuasive.  It is likely that the court will be able to make categorical determinations regarding the applicability of Section 230, rather than having to resort to individual adjudications.  Plaintiffs have shown that common legal and factual issues will present a significant aspect of the case.  For example, a predominant legal and factual inquiry is whether the TOS, which allows Linden to confiscate class members' virtual land and property, is unconscionable or otherwise unenforceable against Second Life users whose accounts Linden suspended or terminated.  This classwide challenge, along with others previously identified, is subject to common proof and sufficiently predominates over individual issues.  *See Negrete*, 238 F.R.D. at 489.

Additionally, the court is satisfied at this time that Plaintiffs' classwide questions of liability predominate over individualized damage calculations.  *Herrera v. LCS Fin. Servs. Corp.*, 274 F.R.D. 666, 680-81 (N.D. Cal. 2011); *see also Ellis*, __ F. Supp. 2d __, __, 2012 WL 4371817, at *47 (finding individualized hearings regarding damages "narrow in scope and significance when compared to the threshold, classwide issues subject to generalized proof").  To begin with, should Plaintiffs establish that Subclass A members are entitled to reimbursement of lindens and U.S. dollars, the calculation of remedies would be exceedingly straightforward.  As to virtual land and items, Plaintiffs initially sought to assess their virtual items for purposes of calculating damages by determining the "market value" in Second Life of every single item in every class member's account.  (Hr'g Tr. 15:17-16:1.)  After the court expressed incredulity at the feasibility of such a vast undertaking and noted its highly individualized nature, Plaintiffs reconsidered.  Ultimately, Plaintiffs took the position that they would measure damages for the conversion or confiscation of virtual items based upon the price paid by the user for the item, "because that is what was confiscated . . . from them."  (Hr'g Tr. 49:15-20.)  Plaintiffs represented that the determination of the prices paid for

United States District Court

For the Northern District of California

both virtual items and virtual land by users would involve the "ministerial" review of Linden's transaction records. (Hr'g Tr. 17:18-22.) Defendants did not challenge this representation. Without accepting the method for calculating damages proposed by Plaintiffs, the court concludes that individualized questions regarding damages do not bar certification under Rule 23(b)(3). However, the court notes that if it later determines that class action treatment is no longer appropriate, it may modify or decertify the class. *See* Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment."); *see also Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982) ("Even after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation.").

### ii.    Superiority

A plaintiff can satisfy the superiority requirement when he or she can show that "class-wide litigation of common issues will reduce litigation costs and promote greater efficiency." *Valentino*, 97 F.3d at 1234. To make this determination, the court should consider the following factors: "the interest of members of the class in individually controlling the prosecution or defense of separate actions; the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; the desirability or undesirability of concentrating the litigation of the claims in the particular forum; [and] the difficulties likely to be encountered in the management of a class action." Fed. R. Civ. P. 23(b)(3)(A)-(D).

Defendants do not challenge the superiority of the proposed class action over other forms of adjudicating the disputed matters. Defense counsel acknowledged during oral argument that there is no other known pending litigation against Linden that relates to the issues raised herein. (Hr'g Tr. 54:1-18.) Furthermore, nothing in the record to suggests that concentrating the litigation in this forum would be undesirable, or that a class action on behalf of Subclass A would be unmanageable. The court concludes that Plaintiffs have met their burden of showing that a class action on behalf of Subclass A would be a superior method for resolving the litigation.

### 3.    Ascertainability

Defendants also challenge the proposed Subclass A on the ground that the class, as defined, is not ascertainable or sufficiently definite. As previously stated, Plaintiffs clarified at oral argument

**United States District Court**

For the Northern District of California

1   //

2   //

3   //

4   that Subclass A only includes users whose Second Life accounts were closed or suspended by

5   Linden, and does not include users who do not have access to their Second Life accounts because

6   they refuse to accept the TOS as a prerequisite to account access.  Such a class should be easily

7   ascertainable through Linden's records.

8          Defendants further contend that Subclass A is not ascertainable because it includes members

9   whose accounts were terminated for valid reasons.  (Defs.' Opp'n 24.)  Plaintiffs have alleged,

10  however, that Linden deliberately or intentionally converted or confiscated property remaining in

11  terminated accounts, regardless of the reason for termination.  Although the account records and

12  virtual land records are maintained in separate databases, nothing in the record raises the concern

13  that Defendants will not be able to ascertain what virtual land, virtual items, or currency were in an

14  account upon suspension or termination.  The court determines that the proposed class is sufficiently

15  ascertainable.

16         **C.      Evidentiary Objections**

17         Finally, Defendants object to certain portions of the Archinaco Declaration on grounds of

18  hearsay and the best evidence rule.  [Docket No. 100.][13]  The court overrules Defendants' objections

19  to the following evidence as moot, because in reaching its determination, the court did not rely upon

20  any of the evidence: paragraph 3, exhibit 1-B; paragraph 11, exhibit 1-J; paragraph 12(c); paragraph

21  12(f); paragraph 12(i); paragraph 12(j); paragraph 12(l); paragraph 12(o); paragraph 12(q);

22  paragraph 12(r); paragraph 12, exhibit 1-E; and paragraph 15, exhibit 1-J.

23         Defendants also objected to paragraph 12(d) of the Archinaco Declaration, which contains

24  testimony by Coralee Lack, Linden's rule 30(b)(6) witness, about the March 2010 TOS (*see*

25

26  ────────────────

27         [13]   Plaintiffs correctly point out that Defendants failed to include the objections in their
     opposition brief pursuant to Civil Local Rule 7-3(a).  However, the court denies Plaintiffs' motion to
28  strike the objections, because even if Defendants' brief had included the objections, the brief would have
     remained within the page limits.

United States District Court

For the Northern District of California

1  Archinaco Decl. Ex. 1-A at 66:9-19, 69:15-25-70:13 (Lack Dep.)), on the grounds that it violates the

2  best evidence rule and that it is hearsay.[14]  Defendants' best evidence objection is overruled.  The

3  best evidence rule provides that "[a]n original writing, recording, or photograph is required in order

4  to prove its content unless these rules or a federal statute provides otherwise."  Fed. R. Evid. 1002.

5  However, Federal Rule of Evidence 1007 provides an exception to the best evidence rule, and

6  provides that the "content of a writing . . . [may be proven] by the testimony [or] deposition . . . of

7  the party against whom the evidence is offered."  Fed. R. Evid. 1007; *see Pacheco v. Homecomings*

8  *Fin., LLC*, No. C 08-3002 JF (HRL), 2010 WL 2629887, at *6 (not reported in F. Supp. 2d).  The

9  cited testimony about the March 2010 TOS is by Ms. Lack, Linden's own 30(b)(6) witness;

10  therefore, the Rule 1007 exception applies.  Further, Defendants have submitted the actual March

11  2010 TOS about which Ms. Lack testified, thus curing any defect.  (*See* Lack Decl. Ex. F.)

12  Defendants' hearsay objection is also overruled.  Hearsay is a statement, other than one made

13  by the declarant, offered in evidence to prove the truth of the matter asserted.  Fed. R. Evid. 801(c).

14  However, a statement made by an opposing party in an individual or representative capacity that is

15  offered against the party is not hearsay.  Fed. R. Evid. 801(d)(2).  Ms. Lack's statement about the

16  March 2010 TOS is not hearsay under Rule 801(d)(2).

17  **IV.  CONCLUSION**

18  For the reasons set forth above, Plaintiffs' motion for class certification is GRANTED only

19  as to Subclass A, which shall be defined as follows:

20  All persons whose assets, including virtual items, virtual land, and/or currency in lindens
    and/or U.S. dollars, have been deliberately and intentionally converted by Defendant

21  Linden's suspension or closure of their Second Life accounts.

22  Plaintiffs may proceed on behalf of this class on the claims for conversion, intentional interference

23  with contractual relations and prospective economic advantage, and unjust enrichment.  Plaintiff

24  Naomi Hemingway is appointed as Class Representative for Subclass A.  Pursuant to Federal Rules

25  of Civil Procedure 23(c)(1)(B) and 23(g), Jason Archinaco and Robert Bracken of

26

27  [14]  Asked whether the statement "Virtual Land is In-world Space That We License" existed in

28  prior terms of service agreements, Ms. Lack testified, "I don't think that it was there before, no."
    (Archinaco Decl. Ex. 1-A at 70:4-13 (Lack Dep.).)

1   Archinaco/Bracken, LLC, and Michael Aschenbrener of Aschenbrener Law, P.C. are appointed

2   Class Counsel.  Plaintiffs' motion is DENIED in all other respects.

3

4         IT IS SO ORDERED.

5

6   Dated:  November 20, 2012

7   

8   _____
    DONNA M. RYU
    United States Magistrate Judge

**United States District Court**
For the Northern District of California

29